WILLIAM E. T. SMITH and Others, Respondents, *v.* JOHN J. BARTLETT, Appellant.

Second Department, December 20, 1918.

Real property — colonial patents, grants and Indian deeds construed — purchase from Indians — leave from Governor under provision of Colonial Laws — will — description of land devised construed — when court will not correct description by testator.

Provisions of Colonial patents and grants and of Indian deeds examined, and *held,* that a testator at the time of the making of his will prior to 1704 owned a triangular parcel of land at present named "Yaphank neck" and bounded by the Connecticut river on the east, by the Yaphank creek on the south and west and by the Asawsunce swamp on the north.

Under the Colonial Laws of New York, enacted October 23, 1684, before the purchase of land may be effected from Indians, leave must first be had from the Governor or signified by warrant under his hand, and also satisfaction for the said purchase acknowledged by the Indians with provision for record.

Provisions of the will by said testator, who had been a chief justice and a probate judge, and who was familiar with his own deeds of the property in question and knew that Yaphank was the name of a creek or river that joined the Connecticut, and that his patent, his Indian deed and the official survey on which his patent was based ran to such junction and along such creek to a tree at its head and thence north, by which he devised " all my Land and medow on the West Side of Conecticut or Sebomuch river beginning at the head of Yaphanck and by a North Lyne Untill it Comes againe to the River as is p my patent Set forth," cannot be construed so as to extend the single line in the devise to cover what is in the whole patent on the west side of the Connecticut river and thereby include the triangular parcel known as Yaphank neck.

The court may not recast and enlarge descriptions in a will of land devised by a particularly competent testator.

APPEAL by the defendant John J. Bartlett, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Suffolk on the 22d day of May, 1917, upon a decision of the court after a trial at the Suffolk Special Term.

*Jesse W. Johnson,* for the appellant.

*John Larkin* [*George B. Keeler* with him on the brief], for the respondents.

THOMAS, J.:

In the county of Suffolk, L. I., there is a triangular parcel of land at present named Yaphank neck. It is bounded by the Connecticut river on the east, by the Yaphank creek on the south and west, and by the Asawsunce swamp on the north. The question is whether the land under water opposite it to the center of the Connecticut river is owned by the plaintiffs or by the defendant. The decision depends upon the will of Col. William Smith, who died in 1704. If he devised Yaphank neck to his daughters Jeane and Gloriana, they took to the center of the river. Otherwise his sons, under whom plaintiffs claim, and to whom he made devises on the easterly side of the river, took the whole bed of the river. The testator, Col. Smith, owned the bed of the river, and it has been decided in this case that the sons took all such bed, in case the testator did not devise to his daughters the upland on the westerly side (180 N. Y. 360); but if he did so devise to the daughters, their upland carried the land under water to the center of the river. If the devise to the daughters covers Yaphank neck, it is immaterial whether Col. Smith did or did not own it. The sons accepted the will in its entirety and if he assumed to devise Yaphank neck to his daughters, the sons could not, and plaintiffs claiming under them cannot, accept other testamentary provisions for themselves and dispute an attempted devise to the daughters. But, even in that case, the ownership of the neck by the testator is relevant to the question whether he devised it. For it may be considered that a man would not devise what he did not own, and if he owned it, there is improbability that he died intestate as to it, and I find no specific disposition

of it unless to the daughters. It is just to reason that a man would devise what he had reason to believe was his own. When Col. Smith took his patent he had substantial, and what should have seemed to him conclusive, reasons for believing that he owned Yaphank neck, and I deem the reasons irrefutable. Indeed, upon the first trial of this action the plaintiffs conceded or affirmed that their ancestor did own it. But after the Court of Appeals had decided that in such case the opposite land under water went with the upland to the daughters, the plaintiffs denounced ownership in Col. Smith and asserted that their testator never owned it. The testator had two influencing reasons for believing that he owned Yaphank neck: (1) Because on October 9, 1693, he had from the crown a patent for land including it, which was based on a survey and certificate made by virtue of the Governor's warrant; (2) because after controversy with the town of Brookhaven respecting the limits of his holding, the trustees on November 27, 1693, made an official declaration that (I use modern spelling) " they had nothing to object against the limits, bounds, powers, privileges within the said patent contained." A similar resolution was passed by the trustees and freeholders on May 1, 1694. What after that deterred Col. Smith from confiding in his title? March 7, 1666, Governor Nicolls had granted in a patent to the inhabitants of the town of Brookhaven " all that tract of land which already hath been or that hereafter shall be purchased for and on the behalf of the said town whether from the native Indian proprietors or others within the bounds and limits hereafter set forth and expressed." That patent covers the present Yaphank neck and shows grant prior in time to the Fletcher patent to Col. Smith of October 9, 1693. Although the town in 1693 and 1694 by the resolutions noticed withdrew all pretensions to the place, defendant insists that before 1693 by virtue of the town's power under its patent, rights had accrued to Terrill, under whom defendant claims, which had priority over Smith's patent and which were not disturbed by subsequent events. On October 28, 1680, the constable and overseers (by what authority does not appear) of the town made an agreement with Samuel Terrill to come and live in the town and work at his trade, in consideration

of which " the townes men in the behalve of the towne doth
grant and have given unto the above sayd Samuell Turell
twenty akers of land as followeth that is to say seven akers
for a home lott next beyound the greate hollow and five akers
in the little neck and the Rest aboute the Southwest devission."
" Little Neck " is not necessarily Yaphank neck, as in those
days Yaphank neck does not seem to have been a term used,
and Col. Smith's will refers to a " Litell Neck " in another
locality. On April 2, 1681, the town meeting voted Terrill
the " twenty akers of land or halve acomadations with
comeneg belonging to it that is to say 5 akers in the little
neck and the Rest maed up where it can be found convenient
akording as it formerly was Recorded upon the same conditions
butt if the said Terell shall Remove within three yeeres then
the land to Return to the towne againe." The identity of the
grant with Yaphank neck is not satisfactory. By instrument
dated March 28, 1681 (the previous month, that is), Miller
sold to Terrill " comeneg," indicating Terrill's presence in the
town. It was after such events and on November 13, 1688,
that " Kopenhage alias Toridge, Indian, liveing in Brook-
havens presints " granted to Terrill " a certaine tract of Land
& meddow, sittuate, liing and beeing on ye south side of the
Township of Brookhaven, * * * butting and bounded
on the east by a River coled East Conneticutt, south by a
small River coled East Connecticutt, south by a small River
called Yamphank, where it joins to the said Connecticut
river. West by a tree marked at the head of said Yamphank,
North by a swamp called Asawsunce." That grant was
Yaphank neck. The name Yaphank neck did not appear in
that period, but note (1) the grant includes the present
Yaphank neck; (2) there was then a river called Yamphank,
and its juncture with the Connecticut was one of the south
boundaries, and the marked tree at the head of the Yaphank
was the west boundary, and the north boundary was the
Asawsunce swamp, which is the northern boundary of Yap-
hank neck. The deed was entered in the records of the town
in Liber B, page 250. The date of recording does not appear
in the record. There are no other evidences of title in Terrill
before Col. Smith in 1693 took his patent based upon the
official survey, and the trustees of the town estopped them-

selves in that and the following year by a resolution recognizing Smith's title. (*Trustees, etc.,* v. *Smith,* 118 N. Y. 634.) But Terrill's title, if valid, was affected neither by Smith's patent nor by the town's resolution. It may be inquired why Col. Smith, the Governor and the town ignored Terrill. The Indian deed to Terrill of itself conveyed no title but it was a condition precedent to a patent from the crown. An act published in the year 1664, known as the Duke of York's Laws, declared that no purchase of land from Indians after March 1, 1664, should " be Esteemed a good title," without leave first had and obtained from the Governor, " and after leave so obtained, The Purchasers shall bring the Sachem and right owner of such Lands before the Governoure to acknowledge satisfaction and payment for the said lands whereupon they shall have a grant from the Governoure And the Purchase so made and prosecuted is to be entered upon record in the Office & from that time to be valid to all intents and purposes." (1 Colonial Laws of N. Y. [Comp. Stat. Rev. Comm.] 40.) The Colonial Legislature (1 Colonial Laws of N. Y. [Comp. Stat. Rev. Comm.] 149, chap. 9), enacted October 23, 1684, provided similarly as to the effect of purchase from Indians and required leave first had from the Governor signified by warrant under his hand and seal and entered on record in the secretary's office, and also satisfaction for the said purchase acknowledged by the Indians, with provision for record. There is no evidence that the Governor authorized Terrill's Indian purchase, or of a grant from the Governor, but the Indian deed indicates that Terrill sought to strengthen whatever was voted him at town meeting as above noticed, or to acquire other or new rights, but that something prevented him from obtaining a confirmatory grant from the Governor. The explanation of doubts and controversies is, I think, found in the fact that the town of Brookhaven, having the Nicolls patent of 1666, received another patent from Governor Dongan in December, 1686. It was largely confirmatory of the Nicolls patent, but in part derogatory. The Nicolls patent granted to persons named " as patentees for and on the behalf of themselves and their associates the freeholders and inhabitants of the said town of Brookhaven their heirs successors and assigns all

that tract of land which already hath been or that hereafter shall be purchased for and on the behalf of the said town whether from the native Indian proprietors or others within the bounds and limits hereafter set forth and expressed." The Dongan patent confirmed the Nicolls grant in the language quoted, but saved to the crown " all the Tracts & Necks of Land that lyeth to the South within the Limitts & Bounds aforesaid that remaine unpurchased from the Native Indians." That amended the grant under the Nicolls patent to land " which already hath been or that hereafter shall be purchased for and on the behalf of the said town whether from the native Indian proprietors or others." There is no evidence that any one on behalf of the town, its inhabitants, or other person, had prior to the Dongan patent in 1686 purchased Yaphank neck from the Indians or any other owner. The Nicolls patent, as confirmed by the Dongan patent, granted what had been purchased by anybody within its terms to December 27, 1686, the date of the Dongan patent. Evidence of purchase was the condition of taking. Terrill did not purchase of the Indians until 1688. Although the town meeting voted Terrill some land claimed to be in Yaphank neck, the inhabitants could not grant it until they or some of them had purchased it. On May 12, 1689, there were Indian deeds to Col. Smith, the first of which carried grants of the whole river and ten perches west of it, and the second of which described lines " from the Mayne Sea alonge the River or Brooke northward called Yaphanke and from the head of Said Yaphanke North into the Woods," excepting premises sold to two several individuals named and " the Medow Next to the Bay Sould to the Towne of Brokehaven." The following October 5, 1693, Col. Smith petitioned the Governor, Fletcher, and stated that by license from Governor Slaughter he purchased from Indians land in the town of Brookhaven " and that by a warrant from " the captain general, the surveyor " of the Province hath surveighed the same and made return." That survey described with much particularity boundaries and among them this line " from ye main sea Or Ocean to the Westermost Bank of a River Called East Conneticutt and So Along ye bank of the said River to A Creek *Running out of the said River* Called Yaphank and So

Along the South West Bank of the said Creek Unto — head the whole Creek   *   *   *   Pine Tree at the head of the said Creek and so in A Direct — Line Untill it Comes to the Bank of Conneticut River," etc.   It was during the same fall and on November 27, 1693, that the town formally acquiesced in Col. Smith's patent in the manner already quoted, and repeated it in 1694.   There is, in my judgment, scant doubt that Yaphank neck was reserved by the crown in the Dongan charter, and that Col. Smith brought himself within the statute in purchasing from the Indians, and that he obtained title from the crown, and that when he made his will he believed that he owned the land, and that he did own it. When this litigation began, the plaintiffs considered that Col. Smith had owned it; the first trial court so found, this court affirmed (79 App. Div. 174), and the Court of Appeals (180 N. Y. 360) reversed the judgment upon the ground that upon the finding that the daughters took Yaphank neck they took with it the *locus in quo*.   Upon the second trial it was found that Col. Smith had the title to Yaphank neck and the judgment thereon was affirmed on appeal (198 N. Y. 619).   In *Trustees, etc., v. Smith* (118 N. Y. 634, 640) it was decided that the Dongan patent did reserve to the crown lands, and that the action of the town respecting the Smith patent identified the lands granted Smith as a portion of the lands reserved.   But while I consider that Col. Smith owned Yaphank neck when he made his will it does not follow necessarily that he devised it to his daughters, although it has bearing on the probability of it.   The conclusion and finding in earlier records in this action that he did so devise it were influenced substantially by a now conceded error in the certified copy of Smith's will, whereby in the language of the devise the word " Yaphanck " was changed to " Yaptianeck."   The devise is: " To my Yongest Daughters Jeane and Gloryana I doe give to bee equally devided betwixt them all my Land and Medow at Weston hooke in Company with Coll Schuyler Mr. Abeell &c. as allsoe all my Land and medow on the West Side of Conecticut or Sebomuck river begining at the head of Yaphanck and by a North Lyne Untill it Comes againe to the River as is p my patent Set forth."   It should be noted that the testator, aside from the implication that the Connecti-

cut river is the eastern boundary, uses but one line to describe
the devise, that is, the line that makes the hypothenuse of
the triangle, and that no base or southern line of the triangle
is mentioned, but must be implied.  On the earlier trials
the, court induced by the erroneous word " Yaptianeck,"
regarded the line as starting toward the lower end of Yaphank
neck, as the place is known in more modern times, whence
a line ran north to the river.   But I repeat that in the days
of Col. Smith the name " Yaphank Neck " as such does not
appear.   Yaphank was the name of a creek, river or brook.
In the Indian deed to Smith it is called a " River or Brooke "
along which a northwest line ran, and from the head of which
a line ran north into the woods to the middle of the island.
Graham's survey, as already quoted, takes the line to a " Creek
Runing out of the " East Connecticut river " called Yaphank
and So Along the South West Bank of the said Creek " to the
head of the " whole *Creek*," and the pine tree at the head of
the creek is mentioned.   The patent to Smith carries the
line " to a *Creek Running out* " of the East Connecticut, " and
soe along the southwest bank of ye sd creek unto its head the
*whole creek included*, to a marked pine tree at y head of ye
sd creek, and soe in a direct north line."   The Indian deed
to Terrill, which purports to convey the present Yaphank
neck, describes " a *small River* called Yamphank " and
bounds the land by it on the south " where it joins to the
said Connecticut river," and notes a marked tree " at the
head of said Yamphank " whence the final boundary is to the
north.   Col. Smith knew what was in his own deeds; he knew
that Yaphank was the name of a creek or river that joined the
Connecticut.   He knew that his patent, his Indian deed, and
the official survey on which his patent was based, ran to such
junction, and along such creek to a pine tree at its head and
thence north.   And yet in the devise to his daughters he
disregarded all lines of description of Yaphank neck southerly
of the " head of Yaphanck," as they appear in the patent, and
from that point, and that only, ran a course to the Con-
necticut river.   If he meant to begin at or near the junction
of the Yaphank and the Connecticut river and give what his
patent carried to him, he would have started at such junction
and then following his patent have said: " and soe along the

southwest bank of the said creek unto its head, the whole creek included, to a marked pine tree at the head of the said creek." But he left out all of such descriptive words, quoted words that marked lines that in all formal instruments of the time marked the inclosure of Yaphank neck, save the ·north line. But that very north line is the first and only one he mentions in the devise to his daughters, and thereby he incloses a parcel of land entirely north of Yaphank neck, and totally excludes Yaphank neck. Could the omission have been accidental? Did Col. Smith by inadvertence begin at a point and draw a line that would exclude Yaphank neck if he intended to devise it to his daughters? It seems improbable, if not impossible, if one judges only by what appeared at the time Col. Smith made the will. And yet there is something to be said in favor of such error, if, indeed, a court 200 years thereafter may so consider it. The devise to the daughters is " begining at the head of Yaphanck and by a North Lyne Untill it Comes *againe to the River as is p my patent Set forth.*" That indicates (1) that the line has been *once* to the Connecticut river, and that it goes to it " againe; " (2) that Col. Smith's patent describes the entire line meant. But there is no specific description in the devise to indicate that the line touched the river in more than one place, although if the true line meant is one to be drawn north from the head of the Yaphank to the river line, a further line from the Yaphank easterly to the river would be implied. But the words quoted above may be explained as referring to the line from the tree north to the river, as set forth in the patent, because the patent does establish a line from the marked pine tree at the head of the creek in a direct north line to a marked tree on the west side of the Connecticut river. It is true that the patent also describes lines earlier than that and later than that alone used in the devise. Hence, the question is whether the meagerly described single line in the devise is to be extended to cover what is in the whole patent on the west side of the river. I think that the court may not so recast and enlarge the expression of a person so competent and particular in his gifts as Col. Smith seems to have been. He had been chief justice of the Province of New York, a probate judge, a judge of the Supreme Court of Judicature, and he was for a time acting

Governor of the province. Shall this court say that in using words that exclude Yaphank neck he meant to include it? The learned counsel for appellant urges that the patent calls the Yaphank "a creek *running* out of the Connecticut;" that a creek running out cannot be regarded as a river, brook or creek running into another river, but that a creek is a recess, cove, bay or inlet, and that the line begins near the place where the tidal water ran out of the Connecticut; that is, toward the inner point of the inlet or cove, as it then was, as shown on the map of Graham, surveyor, and not at the sources of a small stream that made its way thence to the neighborhood of Asawsunce swamp. But that sets adrift in speculation the location of the "head of Yaphank." It proposes a pine tree somewhere in a cove, and at its head, that is, where the cove stops. But where did it stop? The cove, if such the mouth of the widening Yaphank is, did not end in dry land, but narrowed into a stream extending northwesterly and a line along its "southwest bank" to the head of Yaphank creek and then north to the Connecticut river would inclose more land than a line drawn directly north from some place near its junction with the Connecticut, and would not inclose the whole of Yaphank neck as now known. By the appellant's argument, the creek after it ascends beyond what appellant calls an inlet, would be excluded from Col. Smith's patent. But the north line from the head of the Yaphank is the line between the grant to Col. Smith and land of the town of Brookhaven, and it was so indicated in *Trustees, etc.,* v. *Smith (supra).* The Hulse map, made from a survey in 1797, shows the line running through the head of Yaphank creek. Graham's map shows a direct and shorter line running somewhat north of west out of the Connecticut river, and then a straight line running north, and at the angle of the two lines is the word "Yapha." There is nothing in the diagram to indicate the length of the first line. But Graham's description, as already noted, is "a Creek *runing out* of the said River called Yaphank and So Along the South West Bank of the said Creek Unto — head the whole creek   *   *   *   Pine Tree at the head of the said Creek." The head of the whole creek would be at its headwaters, not at some point near its mouth. As I have earlier noted, the Yaphank was regarded as a river,

or brook, flowing into the Connecticut. I repeat that Col. Smith's Indian deed so described it. The Indian deed to Terrill describes it as a " small river." The creek has its beginnings just north of the South county road, and widens as it descends towards the southeast to its junction with the Connecticut, a distance of between a half to three-quarters of a mile, and the tide ebbs and flows, as the Surveyor Raynor estimated, half way or more of that distance. If the north line started where the tide ceases, it would include part of the neck and exclude the rest of it. I conclude that the head of the Yaphank river and not the indefinite head of the inlet where it enlarged and where the tide flowed, must be regarded as the place where Col. Smith starts the first boundary line in his devise to his daughters. That would exclude Yaphank neck and the land under water opposite it in the Connecticut river. But this conclusion does not end embarrassment. If Col. Smith's patent gave him title to Yaphank neck as against Terrill, and I conclude that it did, what did he do with it? Did he own it when he made his will on April 23, 1704, and when he died in the same year? If so, and if he did not give it to his daughters, what did he do with it? No devisee or heir-at-law of Col. Smith claiming under his will is shown to have been in possession of it at any time. None of his children is shown to have claimed the neck. No successors by will or otherwise of the sons ever claimed it. Did it pass as undevised? If so, the heir-at-law disregarded it. Did the sons take it as residuary legatees? If so, by what provision of the will? It was for the purposes of the discussion assumed on the first appeal in this action to the Court of Appeals (180 N. Y. 360) that there is a residuary clause that covered the land under water, but the assumption did not extend to Yaphank neck. But if the sons took Yaphank neck as residuary legatees, where and when did they ever assert title to it? I discover neither time nor place. If even the daughters took it under the will, what did they do with it? So far as revealed in the record, they did nothing. Gloriana's son did. In 1737 Crook *ex dem.* George Murison, son of Gloriana, sued in ejectment Homan, claiming under Terrill. Jeane and Gloriana were then dead, and George Murison is considered to have had any title they took from Col. Smith. The minutes of the

first trial in *Crook ex dem. Murison* v. *Homan* show that the plaintiff introduced in evidence (1) the patent to Col. Smith; (2) Col. Smith's will; (3) a deed from Nicolls to Power and a deed from Richard Power to Nicolls, the relevancy of which do not appear; (4) the boundaries of the town of Brookhaven. Homan introduced in evidence (1) Governor Nicolls' confirmation of lands in Brookhaven; (2) grant from the town of Brookhaven to Terrill; (3) Terrill's second grant; (4) Indian deed to Terrill. It is clear enough that the plaintiff claimed something under Col. Smith's will, presumably under a devise to his mother and aunt, and Homan under a grant from the town and the Indian deed to Terrill. On the second trial in 1738 the parties introduced the documents mentioned and some others, viz., the Indian deed to Col. Smith, two town records of Brookhaven, a record kept in Col. Smith's family, in behalf of plaintiff, and a conveyance from Terrill to Woodhull, another from Terrill to Mosier and indorsement thereon, one from Woodhull to Homan, one from Smith to Conclin, and from Smith, Jr., to Terrill, in behalf of defendant, who also called Major Smith as a witness. The pleadings and judgment are not produced. Major William Smith was a brother of Col. Smith's daughters. With that imperfect record, there must be much conjecture as to the issues involved. The plaintiff claimed as the lessee of Gloriana's son, Murison, and the evidence introduced by plaintiff indicates rather satisfactorily that Murison claimed under the will of Col. Smith. Murison claimed against Homan, who derived title from Terrill, the only person who is shown to have claimed title in hostility to Col. Smith. There were introduced the fundamental documents that are before the court at the present time — deeds, patents, grants, resolutions of the trustees of the town, the will of Col. Smith, and the Indian deed and town grants to Terrill. Moreover, it appears in the present record that the trustees of Brookhaven passed two resolutions under the date of April 11, 1738, one acknowledging that Samuel Terrill did live in the town, and " Doe allow him to be a proprietor & a tenant in common, accord to ye form grant of ye Towne, and Did allow him to bee the proper Proprietor and owner of Yamphank Neck," while the second resolution is as follows: " Also att this meteing agreed

SMITH v. BARTLETT. **641**

by the Trustes that Capth Roberson shall carry ye Tow
Booke and ye old patten to ye supreme Court att neue yourke
in order for ye Triall mr. homans Case." There is little
difficulty in concluding that the issue involved land on Yaphank
neck. It is suggested that the issue was confined to land which
Major Smith, a brother of the sisters, owned on the west bank
of the river, and which he conveyed to his son, Judge William
Smith. As appears by Major Smith's will, but not his last
one, dated February 24, 1727, he did own land on the west
side of the river, but on October 12, 1737 (the first trial was on
October 19, 1737), he released to his son, Judge William
Smith, Jr., all his land on the west side of the river. The
minutes in the ancient case show a deed from Smith, Jr., to
Terrill. I think it appears with more than usual clearness
that the trial so far as it involved a transaction with Major
Smith and his son had reference to a small piece of land on
the Connecticut river, which Terrill had purchased and sold
to Wood, who obtained from Major Smith a right to build a
mill and finally that the land and mill site came to Major
Smith subject to a lease to another person. It is not necessary
to follow the same. If it was situated on Yaphank neck it
strengthens the assertion of Terrill's rights therein. Indeed,
an ancient document shows that as early as 1717 one John
Terrill (presumably of Terrill's family) conveyed fifty acres
in Yaphank and there are conveyances bearing upon his title
and that of Homan. What inferences should be drawn from
the imperfect record of the trial of the Crook-Murison-Homan
litigation in addition to the conclusion that it involved Yap-
hank neck? It indicates very clearly that Homan got a title
from Terrill; that, as the jury found, entitled Homan to
the possession of Yaphank neck. It is conceded that the
defendant has the present title and, as I conclude, from
Terrill. It is also an inference of equal value that neither
Homan nor Terrill took title from Col. Smith's daughters or
under his will, but the evidence before the court, then as
now, indicates that Terrill held in hostility to such title.
There is, therefore, dispelled once for all an opportunity
for a presumption, at some time heretofore indulged, that
there was a conveyance from Smith's daughters to Terrill.

It is probable that Terrill claimed adversely under the grants of the town in 1681, and the Indian deed in 1688, but as Col. Smith made his will in 1704, it is not an easy inference that Terrill's title to that wild region had matured by adverse possession at the time that Col. Smith made his will. The ancient ejectment suit indicates that Murison considered that he had inherited from his mother rights to Yaphank neck. If he did have such right it would aid the claim that Col. Smith devised the land to his daughters. If the court construed the will, as I think it must have done, as no question of fact in such regard for the jury can be conceived, it must have been held that the devise to the daughters covered Yaphank neck, otherwise the plaintiff should have been nonsuited. After surveying all the known history presented in the present record, there is but one tolerable explanation of the claim made by Murison, and its probable entertainment by the court, and of the fact that no legatee or heir-at-law, immediate or remote, save Murison, is shown to have ever made the slightest pretense of ownership of the property. If it be accepted that Col. Smith did devise the property to his daughters, all of the above is well explained, except their neglect, so far as appears to take possession of the property, probably then wild land, or to vindicate their ownership thereof against Terrill or whoever from him was receiving the conveyances or possession of the property or parts of the property. It is, of course, possible that the patentee of a great domain in drawing his will, skilled and competent as he was, may have had in mind Graham's map with its short line indicating incorrectly the initial tidal outflow into .the Yaphank creek, and may have misconceived that a line running thence north, thereby making an incorrect line between him and the town, would include Yaphank neck. I have tried to present the various considerations that bear upon the question — but I am of the opinion that the court may not correct the description used by Col. Smith in his will so as to include Yaphank neck. The deeds on which defendant relies, save the immediate deed to himself, do not purport to convey the land under water in the river, nor is the question raised by exceptions. The case of *Crook ex dem. Murison* v. *Homan* decided the question of possession but not necessarily the

question of title.    The findings should be amended accordingly, and also so far as it is found that Col. Smith did not have title to Yaphank neck, but such findings are not material to the conclusion reached by the trial court.

The judgment should be affirmed, with costs.

Present — JENKS, P. J., THOMAS, RICH, PUTNAM and BLACKMAR, JJ.

Judgment unanimously affirmed, with costs.